UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| GERRISHA WIGFALL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:15 CV 230 CDP |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

Plaintiff Gerrisha Wigfall brings this action under 42 U.S.C. § 405(g), seeking judicial review of the Commissioner's denial of her application for child's supplemental security income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, *et seq.* Because the Commissioner's final decision is not supported by substantial evidence on the record as a whole, I will reverse the decision and remand for further proceedings.

## I.  Procedural History

An application for child's benefits was filed on Wigfall's behalf on December 18, 2012, claiming that she became disabled on January 1, 2008. Wigfall was 15 years old when her application was filed.  The Social Security

---

[1] On January 20, 2017, Nancy A. Berryhill became the Acting Commissioner of Social Security. Under Fed. R. Civ. P. 25(d), Berryhill is automatically substituted for former Acting Commissioner Carolyn W. Colvin as defendant in this action.

Administration denied Wigfall's application on March 25, 2013. A hearing was held before an administrative law judge (ALJ) on April 22, 2014, at which Wigfall and her mother testified. On August 13, 2014, the ALJ denied Wigfall's claim for benefits, finding Wigfall's severe impairments of major depressive disorder, post-traumatic stress disorder (PTSD), social anxiety disorder, and anxiety disorder NOS not to meet or medically equal a listed impairment, nor functionally equal a listed impairment. On October 8, 2015, the Appeals Council denied Wigfall's request for review of the ALJ's decision. The ALJ's decision is thus the final decision of the Commissioner. 42 U.S.C. § 405(g).

In this action seeking judicial review of the Commissioner's final decision, Wigfall, now an adult, argues that the ALJ improperly discounted the opinion of her treating psychiatrist and erred in finding that she did not meet a listed impairment.

## II. Legal Standard

A claimant under the age of eighteen is considered disabled and eligible for SSI under the Social Security Act if she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i).

The Commissioner is required to undergo a three-step sequential evaluation process when determining whether a child is entitled to SSI benefits. First, the Commissioner must determine whether the child is engaged in substantial gainful activity. If not, the Commissioner must then determine whether the child's impairment, or combination of impairments, is severe. Finally, if the child's impairment(s) is severe, the Commissioner must determine whether it meets, medically equals, or functionally equals the severity of an impairment listed in Appendix 1 of Subpart P of Part 404 of the Regulations. 20 C.F.R. § 416.924(a); *Garrett ex rel. Moore v. Barnhart*, 366 F.3d 643, 647 (8th Cir. 2004). If the impairment(s) meets or medically equals a Listing, the child is disabled. *Garrett*, 366 F.3d at 647. If a child's impairment does not meet or medically equal a listed impairment, the Commissioner will assess all functional limitations caused by the child's impairment to determine whether the impairment functionally equals the listings. 20 C.F.R. § 416.926a. If this analysis shows the child not to have an impairment which is functionally equal in severity to a listed impairment, the ALJ must find the child not disabled. *Oberts o/b/o Oberts v. Halter*, 134 F. Supp. 2d 1074, 1082 (E.D. Mo. 2001).

To functionally equal a listed impairment, the child's condition must result in an "extreme" limitation in one domain of functioning or "marked" limitations in two domains. 20 C.F.R. § 416.926a(a). The domains are "broad areas of

functioning intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a(b)(1). The six domains used by the Commissioner in making this determination are: 1) Acquiring and Using Information; 2) Attending and Completing Tasks; 3) Interacting and Relating with Others; 4) Moving About and Manipulating Objects; 5) Caring for Oneself; and 6) Health and Physical Well-Being. *Id.*

> A child-claimant has a "marked" limitation in a domain when her impairment(s) interferes seriously with [her] ability to independently initiate, sustain, or complete activities. [Her] day-to-day functioning may be seriously limited when [her] impairment(s) limits only one activity or when the interactive and cumulative effects of [her] impairment(s) limit several activities. "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme."

20 C.F.R. § 416.926a(e)(2)(i). A child has an "extreme" limitation when the impairment "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3). In determining whether a child-claimant's functioning may be marked or extreme, the Commissioner is to review all the evidence of record and "compare [the child's] functioning to the typical functioning of children [the child's] age who do not have impairments." 20 C.F.R. § 416.926a(f)(1); *see also* 20 C.F.R. § 416.926a(b) (in determining child-claimant's functioning, Commissioner looks "at how appropriately, effectively and independently [the child] perform[s] [his] activities compared to the performance of other children [the child's] age who do not have

impairments."); 20 C.F.R. § 416.924a(b)(5).

The Commissioner's findings are conclusive upon this Court if they are supported by substantial evidence. 42 U.S.C. § 405(g); *Young v. Shalala*, 52 F.3d 200 (8th Cir. 1995) (citing *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. *Briggs v. Callahan*, 139 F.3d 606, 608 (8th Cir. 1998). In evaluating the substantiality of the evidence, I must consider evidence which supports the Commissioner's decision as well as any evidence which fairly detracts from the decision. *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010). Where substantial evidence supports the Commissioner's decision, I must affirm, even if a different conclusion may be drawn from the evidence. *Id.*

### III. Evidence Before the ALJ

A.    <u>Testimonial Evidence</u>

At the hearing on April 22, 2014, Wigfall and her mother testified in response to questions posed by counsel and the ALJ. Wigfall was 17 years old and in the eleventh grade at the time of the hearing. She weighed 308 pounds. She failed English the year before but took it again on credit recovery and passed. She has trouble staying focused and awake. Wigfall was suspended from school twice during the school year for arguing with other students. She is irritable and gets

angry easily. Since her grandmother died, she has daily mood swings, anxiety, and depression. Wigfall has been hospitalized twice for depression, most recently in November of 2013, when she was hospitalized at Center Pointe for suicidal thoughts. She has been on different medications for depression without noticing much improvement, but she cannot currently afford medication or counseling. She has a treating psychiatrist and has problems with posttraumatic stress disorder. She has never had a job. (Tr. 32-43).

Wigfall's mother testified that Wigfall cannot get along with others and that she sits in her room in the dark all the time. Wigfall was sexually molested as a five year old and as a school-aged child. Wigfall was given medication for her irritability, but it did not help much and caused side effects. Wigfall went to live with her father because her mood swings made her too difficult for her mother to handle. (Tr. 43-52).

B.    Medical Evidence

1. Hospitalizations

Wigfall was hospitalized for four days in November of 2012 for depression, anxiety, anger, flashbacks, and suicidal ideation. She was reluctant to talk but admitted being sexually abused by a family friend about five years prior and as a very young child. She was also removed from her mother's care at one point because her mother physically abused her. She was diagnosed with mood disorder,

not otherwise specified, depression with much repressed trauma, possible temporal lobe hyperfunction aggravating the anger problems, obesity, and sexual abuse as a child. Her GAF score was 40 during her stay and 55 upon discharge. Wigfall was prescribed Paxil, Terileptal, and Trazodone. Her prognosis was "cautiously optimistic." (Tr. 161-83).

Wigfall was hospitalized a second time for suicidal ideation between November 19, 2013 and November 27, 2013, upon the request of her treating psychiatrist, Laura Huffman, M.D. Wigfall reported increased depression and persistent thoughts of killing herself. She cut her left wrist and burned her right hand with a cigarette lighter. She was feeling down, sad, and overwhelmed, with feelings of hopelessness and worthlessness. Her diagnosis upon discharge was suicidal ideation, acute depression, and PTSD. Her GAF score upon admission was 30 and 75 at discharge. Wigfall's mood at the time of her discharge was noted to be "excited." She was prescribed Wellbutrin. (Tr. 221-28).

2. Treatment with Therapist Hunter

After her first hospitalization, Wigfall began treatment with therapist Joe Hunter, M.A., L.P.C., L.C.S.W. in November of 2012. Wigfall reported being sexually molested by a family friend at age five and then later by one of her sister's friends. She also reported being removed from her mother's care because her mother physically abused her with telephone and electrical cords. She reported

"going off on" her sister. Wigfall admitted that she likes to remember her abuse during these times because it makes her angrier. Her mood was "up and down" and she liked to be alone. (Tr. 194, 197-200).

In December, Wigfall told Hunter that she "lost it" with another student and that she likes "losing it" because people "back off and leave her alone." (Tr. 193). In January of 2013, Wigfall admitted having a "battle controlling her temper." She talked about being sexually and physically abused and stated her anger "helped her to survive" and "became her friend and the one thing she could count on." (Tr. 188).

During her February 2013 visit, Wigfall reported having issues with her choir teacher and her mom. (Tr. 217). In May, Wigfall told Hunter that "a lot" had happened over the last month and that it was "all bad." She said that she was raped by a nineteen year old boy while at a friend's house. She reported the rape to her school counselor, who called Wigall's mother to come to the school. When Wigfall's mother arrived, she and Wigfall got into an argument. Hunter noted that Wigfall had poor eye contact and her mood was depressed. Wigfall said she was hurt, angry, and depressed, with thoughts of hopelessness. (Tr. 212). The next week, Wigfall was still having problems with her mother and was still upset and angry, but she denied cutting herself since her last session. (Tr. 211).

In July of 2013, Wigfall's mother told Hunter that Wigfall's attitude had

become so bad that she called police on her and kicked her out of the house. The police declined to press charges against Wigfall, however, because of all the scratches and bruises on her. Wigfall went to live with her father briefly, but then returned to her mother. She expressed a desire to live with her aunt in Florida, but Wigfall's mother said she did not have money for that. Wigfall became angry at her mother and accused her mother of spending all the family's money at the casino boat. (Tr. 209). The next week, Wigfall reported to Hunter that she had withdrawn to her room and obsessed about the men who abused her. Hunter noted that Wigfall was depressed. (Tr. 208).

3. Treatment with Laura Huffman, M.D.

Wigfall began seeing psychiatrist Lara Huffman, M.D. on November 15, 2012, after being hospitalized for suicidal ideation. Wigfall discussed her history of abuse and difficulties getting along with others. Wigfall admitted "blowing up" at others and significant mood swings caused by medications. Wigfall stated she worries constantly and has bouts of sadness. She was continued on Paxil and advised to continue individual therapy. (Tr. 196). During her next visit with Dr. Huffman on December 13, 2012, Wigfall's continued mood swings were noted. She reported not sleeping well and that she was "barely passing" English. Dyslexia was suspected. Dr. Huffman prescribed Abilify and referred Wigfall for testing for dyslexia and sleep apnea. (Tr. 192).

Wigall saw Dr. Huffman again on January 10, 2013. At that time, Wigfall reported that her mood had gotten worse and that she was getting picked on and had been going on "rages." She could not sleep at night and was sleepy during the day. Mental status examination revealed Wigfall was depressed with suicidal ideation. Dr. Huffman suspected that the inability to sleep was a side effect of Abilify, so she discontinued it and all medications to establish baseline mood and sleep patterns. (Tr. 189). At her next visit on January 24, 2013, Wigfall stated that she preferred staying in bed in the dark, that any good mood did not last long, and that she wakes up irritable and ready to fight. She reported waking up frequently throughout the night and falling asleep in school. She was easily agitated and in bad moods "a lot" with suicidal ideation. Mental status examination revealed a sad affect, decreased eye contact with lots of sighing, and increasing depression. Dr. Huffman noted that Wigfall was experiencing increasing symptoms of depression and prescribed a trial of Lamictal for unstable mood and insomnia. (Tr. 187).

During her February 7, 2013 visit, Wigfall reported that things were "ok, not that bad." She reported occasional passive suicidal ideation. Wigfall still had difficulty with reading comprehension and had five failing grades on her report card. Mental status examination revealed Wigfall's mood was down and her affect was restricted. Dr. Huffman discontinued Lamictal because it gave Wigfall a rash and scheduled her for DNA testing. (Tr. 185).

In March, Wigfall's mother told Dr. Huffman that Wigfall's grades had dropped and that she was increasingly irritable. Her diagnosis was emotional disorder and victim of childhood sexual and physical abuse. Wigfall told Dr. Huffman she was having nightmares, bad moods, was irritated easily, isolative, and down in the dumps. She reported continued difficulty sleeping. Mental status examination revealed decreased eye contact, soft speech, and irritable and depressed mood, and sad affect. Dr. Huffman prescribed Viibryd because Wigfall experienced unacceptable side effects on numerous other medications. (Tr. 216).

On April 2, 2013, Wigfall reported frequent passive suicidal ideation. Her mood switched "a lot" and she had trouble sleeping. Wigfall complained of hearing a beeping noise that no one else could hear. Her mood upon examination was euthymic. Dr. Huffman continued the trial of Viibryd, noting that it was possible Wigfall was nonresponsive to SSRIs. Dr. Huffman stated that Wigfall's baseline risk of harming herself or others was elevated due to her history of abuse. (Tr. 214). On April 25, 2013, Wigfall saw Dr. Huffman again. She had been off Viibryd because she was taking antibiotics and during that time became very angry and got in trouble at school. Wigfall had been having suicidal thoughts, but reported feeling happy the day of her visit. She complained of seeing a "silver flash" in her eye that no one else could see. Dr. Huffman discussed the results of Wigfall's DNA test, which revealed that Wigfall was at an increased risk of side

effects while on SSRIs.  Wigfall's current diagnosis was depression, anxiety, and victim of childhood sexual abuse.  Her medication was continued.  (Tr. 213).

On May 23, 2013, Wigfall told Dr. Huffman that she wanted to hurt herself, make scars, and do "stupid stuff" because injuring herself made her forget about her problems for a few minutes.  She reported having a physical fight with her mother and moving out, but was staying with her mother again temporarily. Wigfall had stopped taking Viibryd because she was not living with her mother, and her mother stated that the medication was ineffective anyway.  Dr. Huffman continued her prescription for Viibryd but was unsure whether Wigfall would refill it because Wigfall indicated that she would be spending the summer with friends or in Florida.  Dr. Huffman observed small areas of scarring on Wigfall's left hand, but Wigfall denied having suicidal thoughts.  (Tr. 210).

Dr. Huffman next saw Wigfall on July 25, 2013.  Her diagnosis was depression, anxiety, and victim of childhood sexual and physical abuse.  Wigfall reported she had not slept for three days and felt "hyper" all the time, but that her mood was good.  Wigfall stopped taking Viibryd because it made her dizzy and nauseous.  She was given a trial of melatonin to help with her sleep issues.  (Tr. 207).

On November 7, 2013, Wigfall's mother called Dr. Huffman to report that Wigfall had been cutting her wrists and arms and had stopped all medications due

to side effects. Dr. Huffman advised hospitalization, and Wigfall was subsequently hospitalized for suicidal ideation for eight days. (Tr. 206).

On January 17, 2014, Dr. Huffman completed a childhood disability evaluation form indicating that Wigfall had "marked" limitations in the areas of interacting and relating with others, caring for herself, and health and physical well-being. She indicated that Wigfall suffered from mood disorder with components of depression and anxiety, frequent insomnia, frequent depressed mood with thoughts of suicide, frequent conflicts with parents including some physical aggression, and unhealthy coping mechanisms with a high risk of sexual and behavioral acting out due to her history of physical and sexual abuse. Dr. Huffman believed Wigfall to be a high risk for risky behaviors because of her history of abuse, and a very high risk for chronic depression and anxiety as an adult. Dr. Huffman opined that Wigfall needed ongoing medical and psychological treatment. Her opinion was based on direct observation and treatment, functional testing, and psychological and psychiatric evaluation. (Tr. 264-66).

4. Consultative Examination by Paul Rexcoat, Ph.D.

Wigfall was examined by consultative psychologist Paul Rexcoat on March 7, 2013. Dr. Rexcoat noted that Wigfall described significant symptoms of major depression and PTSD during examination. He concluded that Wigfall had few

limitations in her activities of daily living because she does dishes and cleans the kitchen and bathroom and then watches two to three hours of television daily. She knows how to cook and do laundry. Dr. Rexcoat opined that Wigfall had few limitations in the area of social functioning because Wigfall stated that she has two female friends she sees outside of school. He also stated that "she usually gets along well with other students and teachers." However, Dr. Rexcoat found "serious limitations" in the area of school functioning because Wigfall was in a special education reading program, was in a credit recovery program, and was getting F's on her report card. He assigned Wigfall a GAF score of 49 and his prognosis was "guarded because of her depression and her problems in school." (Tr. 202-04).

    5. Treatment with Bootheel Counseling Services

    Wigfall sought treatment with Bootheel Counseling Services following her in-patient hospitalization in November of 2013. Her first session was on December 13, 2013, with clinical therapist Kellee Foote, MSW, LCSW. Wigfall reported her history of sexual and physical abuse, her feelings of anger and suicidal ideation, self-harm, her hospitalizations, her difficulties sleeping and relating with others, her anxiety and diagnosis of PTSD, and her difficulties using psychotropic medication due to side effects. Wigfall stated that she "loved [herself] for real" but could not elaborate on what that meant. Foote also noted that Wigfall had been

diagnosed with "cannabis dependence" due to her "reported daily use of marijuana." Foote does not indicate who diagnosed Wigfall with cannabis dependence, but Wigfall stated that she smoked marijuana to relax her with no desire to stop using. Following Wigfall's initial visit, Foote listed Wigfall's strengths as "photography, poems, make up, attire" with her limitations being "support system [and] social environment." Axis I diagnostic impressions were PTSD and cannabis dependence. Her thought content was noted to be unrealistic and she had fair judgment and poor insight. Foote assigned Wigfall a GAF score of 51. (Tr. 252-62).

Wigfall was evaluated by psychiatrist Barbara Willis, M.D., of Bootheel Counseling Services on December 30, 2013. Wigfall reported symptoms of depression, including isolation and irritability, with mood swings, insomnia, poor concentration, and feelings of hopelessness and helplessness. Wigfall reported a great deal of anxiety and endorsed easy startle response, avoidance reaction, and alexithymia. Wigfall reported not taking her Wellbutrin for several days because she left it at her father's house. Wigfall stated that she began smoking marijuana at age 16 and smokes five blunt per day. Wigfall admitted cutting and burning herself. Dr. Willis observed Wigfall to be neatly groomed, but quite irritable and oppositional, and only moderately cooperative with fair eye contact. Wigfall "copped an attitude" when asked about substance abuse and psychotropic

medications. She displayed mood swings. She was alert and oriented and performed the serial sevens. Wigfall's impulse control ranged from good to poor, and her judgment and insight were poor. The remaining results of the mental status examination were otherwise within normal limits. Wigfall's diagnosis was major depression recurrent, PTSD, social anxiety, specific phobias, cannabis dependence, anxiety NOS, with a history of sexual and physical abuse. Dr. Willis assigned Wigfall a GAF score of 46 and recommended outpatient substance treatment, continuation of Wellbutrin, and lab work. (Tr. 248-51).

Wigfall had a second session with Foote on January 2, 2014. During the session, Wigfall complained that she did not like Dr. Willis or the fact that Dr. Willis told her mother about her marijuana use. Wigfall stated that she did not want to see Dr. Willis again or go to substance abuse therapy. She became emotional and uncommunicative, with decreased eye contact and some crying. Wigfall's speech was soft and hesitant, and her judgment and insight were poor. (Tr. 247).

6. Consultative Opinions of Linda Nixon, M.D. and Marsha Toll, Psy.D.

On March 20, 2013, as part of the initial denial of Wigfall's claim, a Disability Determination Explanation form was completed. Wigfall's claim for benefits was considered by two non-examining consultants, Marsha Toll, Psy.D., and Linda Nixon, M.D. According to this form, these non-examining consultants

concluded that Wigfall had a marked limitation in the domain of interacting and relating with others, but less than marked limitations in the domains of acquiring and using information, and health and physical well-being. (Tr. 54-61). The ALJ relied on this form as medical evidence supporting his determination that Wigfall was not disabled.

C.     School Records

Wigfall's school records reflect a 2.1 GPA for the 2011-12 school year and a 1.9 GPA in the 2012-13 school year, with an F in Biology. (Tr. 141-43). Wigfall was in a credit recovery program and her medical records noted difficulties with reading. Wigfall does not receive special services.

### IV. The ALJ's Decision

In his written decision, the ALJ determined that Wigfall had not engaged in substantial gainful activity since the date of application, December 12, 2012. He further found that Wigfall's impairments of major depressive disorder, PTSD, social anxiety disorder, and anxiety disorder NOS were severe but, without explanation, determined that they did not meet or medically equal the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 17). The ALJ also found Wigfall's severe impairments not to functionally equal the severity of the listings, specifically finding that Wigfall had less than marked limitations in the domains of Interacting and Relating with Others, Caring for Herself, and

Health and Physical Well-Being, with no limitations in the remaining domains. The ALJ thus found that Wigfall was not disabled. (Tr. 13-26.)

## V. Discussion

Wigfall contends that the ALJ erred by failing to explain why her impairments did not meet or medically equal the criteria in Listed Impairment 112.04 for mood disorders, which is characterized by either continuous or intermittent persistence of at least five symptoms of major depressive syndrome[2] and results in marked limitations in age-appropriate social and personal functioning. 20 C.F.R. Part 404, Subpart P, Appendix 1, § 112.04. Wigfall also contends the ALJ erred in discounting the opinion of her treating psychiatrist, Dr. Huffman.

On January 17, 2014, treating psychiatrist Dr. Huffman opined that Wigfall had marked limitations in the areas of interacting and relating with others, caring for herself, and health and physical well-being. She indicated that Wigfall suffered from mood disorder with components of depression and anxiety, frequent insomnia, frequent depressed mood with thoughts of suicide, frequent conflicts with parents including some physical aggression, and unhealthy coping mechanisms with a high risk of sexual and behavioral acting out due to her history

---

[2] These symptoms include depressed or irritable mood, markedly diminished interest or pleasure in almost all activities, weight increase, sleep disturbance, fatigue or loss of energy, feelings of worthlessness or guilt, difficulty thinking or concentrating, or suicidal thoughts or acts.

of physical and sexual abuse. Dr. Huffman believed Wigfall to be a high risk for risky behaviors because of her history of abuse, and a very high risk for chronic depression and anxiety as an adult. Dr. Huffman believed that Wigfall needed ongoing medical and psychological treatment. Her opinion was based on direct observation and treatment on at least 11 occasions, functional testing, and psychological and psychiatric evaluation. (Tr. 264-66).

The ALJ assigned Dr. Huffman's opinion "little weight" for the following reasons:

> [T]he claimant has been carrying a full load of classes, which would be inconsistent with the allegation that she was unable to pay attention and could not cope with life. Her grades were adequate at the time of the hearing and the claimant was not being treated for any mental impairments or taking any psychotropic medications. Because the domain assessments by Dr. Huffman are inconsistent with the medical and other evidence of record as a whole, her opinion is given little weight.

(Tr. 20). Instead, the ALJ relied upon the opinions of two non-examining consultants, Linda Nixon and Marhsa Toll, who reviewed Wigfall's records in March of 2013 in connection with the initial denial of her claim and concluded that Wigfall had a marked limitation in one domain, that of Interacting with and Relating to Others, and a less than marked limitation in the domain of Health and Well Being. The ALJ concluded that their opinions regarding less than marked limitations were supported by the records, but that their opinions regarding marked limitations in social interactions were not supported as inconsistent with the

findings of examining consultant Dr. Rexcoat. Dr. Rexcoat, a consulting

psychologist, evaluated Wigfall once in March of 2013 and concluded that Wigfall

had few limitations in the area of social functioning. (Tr. 20).

> With respect to Wigfall's mental impairments, the ALJ found as follows:
>
> Overall, the claimant's presentation in therapy is inconsistent with the descriptions of severe mental symptoms, most of which appear to be confined to a six-month period between December 2012 and May 2013, indicating that even if the symptoms were disabling, they did not last a full 12 months as the Social Security Act requires. Additionally, apart from Dr. Huffman's inconsistent opinion . . . none of the treating providers have offered the conclusion that the claimant was disabled by any impairment or combination of mental or physical impairments.

(Tr. 19). The ALJ concluded that Wigfall "is functional and has a normal GAF"

when she is "compliant with medications and treatment." (Tr. 20). He discounted

Wigfall's GAF scores of 46 and 51 in December of 2013, finding that they had

"not been repeated" and that she was "functional in school and at home, with no

further hospitalizations or emergency department visits for any psychological

condition." (Tr. 20).

"It is the ALJ's function to resolve conflicts among the various treating and

examining physicians." *Estes v. Barnhart,* 275 F.3d 722, 725 (8th Cir. 2002)

(internal quotation marks and citation omitted). "The opinion of a treating

physician is accorded special deference under the social security regulations."

*Prosch v. Apfel*, 201 F.3d 1010, 1012–13 (8th Cir. 2000). The opinions and

findings of the plaintiff's treating physician are entitled to "controlling weight" if

that opinion is "'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'" *Id.* (quoting 20 C.F.R. § 404.1527(d)(2)). "Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole." *Hogan v. Apfel,* 239 F.3d 958, 961 (8th Cir. 2001). An ALJ may "discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Prosch,* 201 F.3d at 1013 (internal quotation marks and citations omitted); *Cox v. Barnhart,* 471 F.3d 902, 907 (8th Cir.2006) (holding that an ALJ may give a treating doctor's opinion limited weight if it is inconsistent with the record). An ALJ is entitled to give less weight to the opinion of a treating doctor where the doctor's opinion is based largely on the plaintiff's subjective complaints rather than on objective medical evidence. *Kirby v. Astrue,* 500 F.3d 705, 709 (8th Cir.2007) (citing *Vandenboom v. Barnhart,* 421 F.3d 745, 749 (8th Cir.2005)). Whether the ALJ grants a treating physician's opinion substantial or little weight, the ALJ must "always give good reasons" for the particular weight given to a treating physician's evaluation. 20 C.F.R § 404.1527(d)(2).

The ALJ's decision to discount Dr. Huffman's opinion and his findings

regarding the severity of Wigfall's mental impairments are not supported by substantial evidence on the record as a whole. Here, the ALJ substantially erred when determining that Dr. Huffman's opinion was entitled only to slight weight because it was allegedly inconsistent with Wigfall's "adequate" grades. Yet Dr. Huffman never opined that Wigfall had marked limitations in the domains of Acquiring and Using Information or Attending and Completing Tasks. Instead, Dr. Huffman found that Wigfall was markedly limited in her interactions with others, ability to care for herself, and health and physical well-being, areas which are not contradicted by Wigfall's so-called "adequate" grades. Moreover, the ALJ exaggerated Wigfall's school performance, as she earned only a 2.1 GPA for the 2011-12 school year and a 1.9 GPA in the 2012-13 school year, with an F in Biology. (Tr. 141-43). The substantial evidence of record does not support the ALJ's determination that Wigfall had no marked limitations because she was performing adequately in school. Wigfall was in a credit recovery program for English and her medical records noted difficulties with reading. Consulting psychologist Dr. Rexcoat determined that Wigfall had serious limitations in the area of school functioning because of her reading problems and poor grades, calling her prognosis "guarded because of her depression and her problems in school." (Tr. 202-04). Contrary to the ALJ's finding, Dr. Huffman's opinion is not undermined by Wigfall's school performance.

The ALJ further erred when he concluded that Dr. Huffman's opinion was entitled to only slight weight as inconsistent with the medical and other evidence of record. The ALJ determined that Wigfall's symptoms were inconsistent with severe mental limitations, and that any disabling symptoms only lasted from December of 2012 until May of 2013. He also determined that Dr. Huffman's opinion was inconsistent because no other treating providers offered an opinion that Wigfall was disabled. The ALJ's finding is contradicted by substantial evidence on the record as a whole, which demonstrates that Wigfall experienced severe symptoms of mental impairments as early as November of 2012, when she was hospitalized for depression, anxiety, anger, flashbacks, and suicidal ideation. She was prescribed psychotropic medications and discharged with a "cautiously optimistic" prognosis. Wigfall then began regular treatment with psychiatrist Dr. Huffman and therapist Hunter. Dr. Huffman noted Wigfall's extreme difficulties with mood swings, anger, sleep difficulties, and side effects from her medication during her first visit in November of 2012.

Contrary to the ALJ's findings, Wigfall's severe symptoms continued well past May of 2013. Wigfall's depressed mood with suicidal ideation, sleep difficulties, mood swings, and difficulties taking her psychotropic medication were reported regularly by Wigfall not only through the time period cited by the ALJ, but also in April of 2013, when Dr. Huffman noted frequent passive suicidal

ideation, trouble sleeping, euthymic mood, and hearing a beeping sound no one else could hear.

At the end of April, Wigfall's suicidal thoughts and mood swings remained, and Wigfall reported seeing a "silver flash" in her eye that no one else could see. Her diagnosis at the end of April was depression, anxiety, and victim of childhood sexual abuse. Despite her problems with side effects, Wigfall's psychotropic medications were continued. During Wigfall's visit with Dr. Huffman in May of 2013, Wigfall admitted cutting and hurting herself to forget about her problems, and Dr. Huffman observed scars on Wigfall's left hand. Wigfall got into a physical fight with her mother and moved in with her father, so she was unable to continue getting her medication. In July, she had stopped taking her psychotropic medication because it made her dizzy and nauseous. Wigfall reported continued sleep disturbances and was "hyper." In November of 2013, Wigfall was cutting her wrists and arms, and Dr. Huffman recommended hospitalization. Wigfall was subsequently hospitalized for eight days for suicidal ideation. Wigfall reported increased depression and persistent thoughts of killing herself. She cut her left wrist and burned her right hand with a cigarette lighter. She reported feeling down, sad, and overwhelmed, with feelings of hopelessness and worthlessness. Her diagnosis upon discharge on November 27, 2013, was suicidal ideation, acute depression, and PTSD. She was prescribed Wellbutrin.

Following her discharge from the hospital in November of 2013, Wigfall received treatment from Bootheel Counseling Services. Wigfall met with Dr. Willis for one session at the end of December and reported symptoms of depression, including isolation and irritability, mood swings, insomnia, poor concentration, and feelings of hopelessness and helplessness. She had anxiety, an easy startle response, avoidance reaction, and alexithymia. Wigfall was irritable and oppositional, and only moderately cooperative with fair eye contact. Wigfall displayed mood swings during the session and a bad attitude when questioned about her use of marijuana. Her impulse control ranged from good to poor, and her judgment and insight were poor. Dr. Willis diagnosed major depression recurrent, PTSD, social anxiety, specific phobias, cannabis dependence, anxiety NOS, with a history of sexual and physical abuse.

The ALJ's finding that Wigfall did not experience severe mental symptoms after March of 2013 is flatly contradicted by the medical evidence of record, including numerous treatment records from her treating psychiatrists and the medical records from her two hospitalizations for suicidal ideation. These records show that Wigfall's symptoms were increasing, not decreasing, despite regular treatment and eventually resulted in a second, extended hospitalization at the end of November. That Wigfall's symptoms were improving upon discharge from the hospital does not support the ALJ's determination regarding the severity of

Wigfall's mental impairments. "Although the mere existence of symptom-free periods may negate a finding a disability when a physical impairment is alleged, symptom-free intervals do not necessarily compel such a finding when a mental disorder is the basis of a claim." *Andler v. Chater,* 100 F.3d 1389, 1393 (8th Cir. 1996). "Symptom-free intervals and brief remissions are generally of uncertain duration and marked by the impending possibility of relapse." *Id.* This is certainly true where the reports of improvement are made upon release from in-patient psychiatric care. The ALJ erred by failing to take into account the cyclical nature of mental impairments and the fact that Wigfall's disability hearing took place only a few months after her last hospitalization. That she may have appeared asymptomatic to the ALJ at the hearing does not undermine the substantial medical evidence of record demonstrating Wigfall's persistent and severe mental symptoms, and it was error for the ALJ to substitute his own judgment for that of Wigfall's treating psychiatrist on this issue. An ALJ may not substitute his own opinions for the opinions of medical professionals. *Ness v. Sullivan*, 904 F.2d 432, 435 (8th Cir. 1990); *see also Pate–Fires v. Astrue*, 564 F.3d 935, 946–47 (8th Cir. 1995) (ALJ may not "play doctor").

Although Wigfall's therapists are not "acceptable medical sources" under

the regulations,[3] their treatment notes may still be properly considered as other medical evidence as they are consistent with Dr. Huffman's opinion regarding Wigfall's limitations. Therapist Hunter began seeing Wigfall at the same time as Dr. Huffman, and his treatment notes are consistent with Dr. Huffman's opinion regarding the severity of Wigfall's limitations. His notes reflect Wigfall's issues with anger over her extensive sexual and physical abuse, her problems getting along and relating with other students, teachers, and family members, mood swings, depression, feelings of hopelessness and suicidal thoughts, self-harming, and obsessive thoughts about her abusers. His observations are consistent with those of Therapist Foote, who saw Wigfall twice – once in December of 2013 and once in January of 2014. Like many of Hunter's sessions with Wigfall, Foote's sessions took place during the time period in which the ALJ concluded that Wigfall was no longer experiencing severe mental symptoms. She found Wigfall had unrealistic thought content, poor judgment and insight decreased eye contact, tearful affect, and soft and hesitant speech. Contrary to the ALJ's findings, this

---

[3] To establish a disability or impairment, the Social Security Administration requires "evidence from acceptable medical sources." 20 C.F.R. § 416.913(a). Such acceptable medical sources include licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech language pathologists. *Id.* "In addition to evidence from the acceptable medical sources listed in paragraph (a) of this section, [the Commissioner] *may* also use evidence from other sources . . . ." *Id.* § 416.913(d) (emphasis added). Other sources include social workers such as therapists Hunter and Foote. *Id.* § 416.913(a). The ALJ had the option to consider their opinions here because they were consistent with the opinion from Dr. Huffman, Wigfall's treating psychiatrist. *Crawford v. Colvin*, 809 F.3d 404, 408 (8th Cir. 2015).

evidence is not inconsistent with Dr. Huffman's opinion.

The ALJ also improperly discounted Dr. Huffman's opinion because, "apart from" her, none of Wigfall's treating providers opined that she was disabled. Dr. Huffman was the only treating provider who rendered an opinion regarding Wigfall's limitations. She was Wigfall's primary treating psychiatrist, with a lengthy treatment history which included regular counseling sessions with her and a therapist, psychotropic therapy, diagnostic testing and lab work, and her eventual recommendation that Wigfall be hospitalized in November of 2013 for her symptoms. Given Dr. Huffman's specialized field of practice and the length and nature of her treatment history with Wigfall, she was in the best position to render an opinion as to Wigfall's limitations and it was error for the ALJ to discount it merely because Wigfall could not offer bolstering opinions from other treating psychiatrists. The regulations do not impose such an impractical and onerous burden on claimants, and it was error for the ALJ to do so here. Certainly, no treating physician ever rendered an opinion that Wigfall was *not* disabled, and none of the medical records from Wigfall's treating providers are inconsistent with Dr. Huffman's opinion, either. The only other treating psychiatrist to see Wigfall was Dr. Willis, who treated Wigfall once on December 30, 2013. During that visit, Wigfall reported symptoms of depression, including isolation and irritability, with mood swings, insomnia, poor concentration, and feelings of hopelessness and

helplessness. She had a lot of anxiety, an easy startle response, and alexithymia. Wigfall admitted cutting and burning herself. Although she was noted to be neatly groomed, she was quite irritable and oppositional, only moderately cooperative with fair eye contact, and displayed poor attitude and mood swings. Her impulse control ranged from good to poor, and her judgment and insight were poor. Dr. Willis diagnosed major depression recurrent, PTSD, social anxiety, specific phobias, cannabis dependence, anxiety NOS, with a history or sexual and physical abuse, and she assigned Wigfall a GAF score at that time of 46. Dr. Willis' findings are consistent with Dr. Huffman's opinion regarding Wigfall's marked limitations.

The ALJ substantially erred in discounting the opinion of Wigfall's treating psychiatrist in favor of those offered by Drs. Nixon and Toll, non-examining consultants who merely reviewed some of Wigfall's medical records in connection with the initial denial of her claim. "The opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not normally constitute substantial evidence on the record as a whole." *Shontos v. Barnhart*, 328 F.3d 418, 427 (8th Cir. 2003). This is especially true here, where the non-examining consultants only reviewed Wigfall's medical records through March of 2013, but Wigfall's significant mental symptoms continued well past that date and included an eight-day hospitalization for suicidal ideation in November of 2013.

Even without all of the records they still found Wigfall had a marked limitation in the domain of interacting and relating with others, just like Dr. Huffman. Yet the ALJ disregarded this portion of their opinions as inconsistent with the opinion of an examining consultant. "As a general matter, the report of a consulting physician who examined a claimant once does not constitute substantial evidence upon the record as a whole, especially when contradicted by the evaluation of the claimant's treating physician." *Wagner v. Astrue,* 499 F.3d 842, 849 (8th Cir. 2007) (internal quotation marks and citation omitted). Dr. Rexcoat, who examined Wigfall once in March of 2013, found that Wigfall had few limitations in social functioning, but serious limitations in school functioning and a "guarded" prognosis. Dr. Rexcoat's opinion suffers from the same deficiency as those of Drs. Nixon and Toll, namely, that it was rendered with only limited consideration of Wigfall's worsening mental symptoms. Like the non-examining consultants, even without all of the relevant medical evidence Dr. Rexcoat still found Wigfall to be seriously limited in some aspects of her functioning. Once again, the ALJ chose to ignore Dr. Rexcoat's findings which suggested that Wigfall had serious limitations in any domain, preferring instead to "play doctor" by substituting his own opinions for that of the medical professionals. In doing so, he substantially erred. *See Pate–Fires*, 564 F.3d at 946–47. An "ALJ's reliance on . . . his own beliefs as to what the medical evidence should show do[es] not constitute substantial evidence" to support a

conclusion that a claimant is not disabled.  *Fowler v. Bowen*, 866 F.2d 249, 252 (8th Cir. 1989).

The ALJ also improperly discounted Dr. Huffman's opinion regarding the severity of Wigfall's limitations because he concluded that Wigfall "is functional and has a normal GAF" when she is "compliant with medications and treatment." He discounted Wigfall's GAF scores of 46 and 51[4] in December of 2013, finding that they had not "been repeated" and that Wigfall was not taking psychotropic medications at the time of the hearing.  The ALJ's findings with respect to Wigfall's GAF scores are contrary to the substantial evidence on the record as a whole.  The most recent GAF scores in the record at the time of the hearing in April of 2014 were those assigned by Dr. Willis (46) and therapist Foote (51) in December of 2013, and there is no evidence in the record suggesting that Wigfall's GAF scores had been assessed or were improved after that time period.  That Wigfall's low GAF scores of December 2013 had not been repeated simply because they had not been measured in the four months prior to the hearing is not evidence that Wigfall's symptoms were improving or that she suffered from no marked limitations.

---

[4]"[A] GAF of 41-50 indicates that the individual has serious symptoms or any serious impairment in social occupational or school functioning."  *Nowling v. Colvin*, 813 F.3d 1110, 1115 (8th Cir. 2016).  "In recent years, the agency has recognized, and we have noted, that GAF scores have limited importance."  *Id*.  However, "GAF scores may be relevant to a determination of disability based on mental impairments."  *Mabry v. Colvin*, 815 F.3d 386, 391 (8th Cir. 2016).

To the extent the ALJ implies that Wigfall's December 2013 GAF scores were an aberration and not indicative of her true GAF scores, this conclusion is contrary to the substantial evidence on the record as a whole. Wigfall's GAF score upon admission to the hospital in November of 2012 was 40 and upon discharge was 55. Her GAF score upon admission to the hospital in November of 2013 was 30. Dr. Rexcoat assigned Wigfall a GAF score of 49 in March of 2013. The only "normal" GAF score (75) Wigfall received was upon her discharge from the hospital in November of 2013 after an eight day stay for suicidal ideation. Yet less than one month later, it had fallen to previous levels. Wigfall's GAF scores from December of 2013 are entirely consistent with her other GAF scores and Dr. Huffman's opinion regarding the severity of Wigfall's limitations, and the ALJ's contrary finding is not supported by substantial evidence on the record as a whole.

The ALJ's finding that Wigfall's symptoms were not disabling when she was "compliant with medications and treatment" is also not supported by substantial evidence in the record as a whole. Throughout her treatment with Dr. Huffman, Wigfall was placed on – and taken off – a myriad of psychotropic medications because they were ineffective and caused severe side effects. The frequency and severity of Wigfall's sensitivity to psychotropic medications eventually led Dr. Huffman to order DNA testing for Wigfall, which revealed an increased risk of side effects while on SSRIs. The only evidence of non-

compliance with medications was either due to severe side effects or the inability of Wigfall (a child) to obtain her medication because of cost or unstable living conditions. Wigfall testified that she was not on medication or seeking mental health treatment at the time of the hearing because she did not have Medicaid. While the failure to seek or remain compliant with treatment is a factor an ALJ may properly consider, here the ALJ substantially erred by refusing to consider the debilitating side effects from medication as well as Wigfall's inability to afford or obtain treatment when determining the nature and severity of her limitations. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1994) (ALJ should consider dosage, effectiveness, and side effects of medication when evaluating claim); *Johnson v. Bowen*, 866 F.2d 274, 275 (8th Cir. 1989) (lack of resources may justify failure to follow prescribed course of treatment).

Here, the ALJ improperly discounted the opinion of Wigfall's treating psychiatrist that Wigfall suffered from marked limitations in the domains of Caring for Oneself, Health and Physical Well-Being, and Interacting and Relating with Others. In so doing, he substantially erred. Because the ALJ's opinion is not supported by substantial evidence on the record as whole, it is reversed and this case is remanded for further proceedings consistent with this opinion. Upon remand, the ALJ is also directed to consider whether Wigfall's impairments meet or medically equal the criteria in Listed Impairment 112.04 for mood disorders.

Although the record strongly suggests that Wigfall is disabled, I cannot conclusively say that she is.

## VI. Conclusion

Because the Commissioner's final decision that Wigfall is not disabled is not supported by substantial evidence on the record as a whole, it is reversed and this case is remanded for further proceedings consistent with this opinion.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is reversed, and this case is remanded for further proceedings consistent with this Memorandum and Order.

A separate Judgment is entered herewith.


_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE


Dated this 22nd day of March, 2017.